THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LOUIS SCHMIDT and          :
CHELSIE SCHMIDT,           :
                           :
            Plaintiffs     :
                           :
    v.                     :        1:11-CV-1782
                           :        (JUDGE MARIANI)
JEREMY FREELAND, et al.,    :
                           :
            Defendants     :

## MEMORANDUM OPINION

### I. Introduction

Before the Court is Defendants' Motion for Summary Judgment (Doc. 31). For the reasons that follow, the motion will be granted.

### II. Statement of Facts and Procedural History[1]

On September 24, 2009, Defendants Freeland and Bitz, then assistant principals at Mechanicsburg High School ("School"), questioned Plaintiff Chelsie Schmidt ("Chelsie"), a minor, regarding her role in distributing drugs in the School. (Defs.' SMF, Doc. 32, at ¶¶ 2-3, 8-12; Pls.' SMF, Doc. 36, at ¶¶ 2-3, 8-12). After approximately twenty to twenty-five minutes, Chelsie admitted to distributing drugs and signed a statement to that effect. (Pls.' SMF at ¶ 13; see also Chelsie Statement, Doc. 33-2, Ex. 7). Once Defendants determined that Chelsie was involved in the distribution of drugs, Bitz called her father, Plaintiff Louis Schmidt ("Louis"), and requested that he come into the School. (Pls.' SMF at ¶ 14).

---

[1] The following recitation is an undisputed statement of facts. Where there is a genuine dispute, the Court will so note.

Louis entered Freeland's office to retrieve Chelsie. (Pls.' SMF at ¶ 19). When Louis reached Freeland's office, he told his daughter "that [he] wanted to speak to her, and [he] told her, 'Get all your things together,' that we're going out to have a private discussion." (Louis Dep., Doc. 33, Ex. 2, 15:23-16:1). Before Plaintiffs could leave, Freeland stated, "You can't leave. You have to stay here. There's things that we have to discuss. (Id. at 17:17-23). Louis responded to Freeland, "You cannot detain me," ignored Freeland's directive, and "proceeded to go into the hallway" with Chelsie. (Id. at 18:21-23; 21:13-19).

As Louis left Freeland's office, physical contact between Louis and Freeland occurred. (See Pls.' SMF at ¶ 20; Defs.' SMF at ¶ 20). Who initiated the contact is in dispute (id.), but the Court will resolve the dispute in Plaintiffs' favor. Louis claims that "Mr. Freeland threw his body into me and body slammed me, slamming my back against the left hand side of the doorway[,] and told me you can't leave and put his arms up around me like he was a bear." (Pls.' SMF at ¶ 20).[2] Freeland acknowledged that he put his "arm on the threshold" of his office door and wanted Plaintiffs to remain in his office so that Louis would "sit down . . . , calm down and have a discussion with [him]." (Freeland Dep., Doc. 33, Ex. 4, at 58:21-59:19, 59:25-60:5). Defendants also acknowledge that "Freeland and Louis touched chests as Louis" exited the office. (Defs.' Br. in Supp., Doc. 33, at 10).

The contact occurred briefly and did not prevent Plaintiffs from leaving Freeland's office. (Pls.' SMF at ¶ 22; Defs.' SMF at ¶ 22). Both parties acknowledge that the encounter

---

[2] Louis did not seek treatment for the alleged assault. (Pls.' SMF at ¶ 21).

2

between Freeland and Louis "was short" and "[it] took only a couple of seconds for Plaintiffs to exit Freeland's office." (Chelsie Dep., Doc. 33, Ex. 3, at 28:13-19; Defs.' SMF at ¶ 22).

Defendants followed Plaintiffs into the hallway, where physical contact occurred again between Louis and the Defendants. Who initiated this contact is disputed but will be resolved in Plaintiffs' favor. According to Louis, Defendants "continued to act like two big bears blocking my body in between them." (Louis Dep. at 23:1-5).

It is undisputed, however, that Louis's encounter with Freeland lasted at most two minutes. (Louis Cell Phone Records, Doc. 33-2, Ex. 6, at 2; Louis Dep. at 20:23-25, 27:9-11, 37:3-40:25). Louis's phone records show that at 3:05 p.m., he called his wife upon arriving at school. (Phone Records, at 2; Louis Dep. at 38:23-39:13). He then called 911 at 3:07 p.m. after his encounter with Freeland but before exiting school property. (Phone Records, at 2; Louis Dep. at 31:6-13, 40:7-12). Louis testified that Plaintiffs spent "[a]pproximately a minute" in the hallway before leaving the School. (Louis Dep. at 27:12-14). Chelsie testified that it took her and Louis a "couple of seconds" to get past Freeland and Bitz in the hallway. (Chelsie Dep. at 26:23-27:3). The encounter also did not prevent Plaintiffs from leaving the School. (See Louis Dep. at 27:12-14; Chelsie Dep. at 26:23-28:10).

Plaintiffs also claim that as they were leaving the School, Freeland grabbed Chelsie's arm. (Pls.' SMF at ¶¶ 28-31). Chelsie testified that Freeland "yanked me back a little bit and then he let go." (Chelsie Dep. at 27:23-28:3). The "yank" occurred for a "shorter

3

period of time." (*Id.* at 28:4-10). Chelsie subsequently sought medical attention for her left arm. (Pls.' SMF at ¶ 32). While her examining physician Dr. Kiran Sharma prescribed Chelsie pain medication, she noted "[n]o external bruising of the left arm or the shoulder, no hematomas . . . [and] no dislocation." (*Id.*; Chelsie Medical Records, Doc. 33, Ex. 9). Dr. Sharma's notes indicate that Louis informed her that Chelsie's left arm had been pulled. (*Id.*)

Plaintiffs allege that "[a]t no time did defendant Freeland ask Louis to calm down and stay to discuss the situation. . . . [Instead,] Freeland . . . advised plaintiffs that they couldn't leave and that he had things to discuss with them." (Pls.' SMF at ¶ 19). Moreover, Plaintiffs assert that Freeland "claimed that he had the right to detain [Louis]" and threatened to call the police if Louis left the School. (*Id.* at ¶¶ 28-31; Louis Dep. at 28:8-25).

As Plaintiffs left the School, both Freeland and Louis called the police. (*See* Pls.' SMF at ¶ 38; Louis Dep. at 30:16-18). Officer Leah M. Repka (Rissinger) of the Mechanicsburg Borough Police Department was dispatched to the High School in response to the calls. (Pls.' SMF at ¶ 40). When Officer Rissinger arrived at the School, Plaintiffs were in the parking lot. (Pls.' SMF at ¶¶ 41-42). Plaintiffs, however, did not speak with Rissinger, because they were "frightened" by her "aggressive posture" upon her arrival at the School. (*Id.* at ¶ 42).

Officer Rissinger issued a non-traffic citation charging Louis with harassment on approximately September 29, 2009 without ever having spoken to Louis. (*Id.* at ¶ 43). As

4

Officer Rissinger stated in her affidavit, the citation was issued based on her "own independent determination to file . . . the citation against Louis E. Schmidt, without the encouragement, direction, influence or inducement of Andrew Bitz or Jeremy Freeland." (Rissinger Aff., Doc. 33-2, Ex. 11). Although Defendants provided her information about the incident, neither Officer Rissinger nor the District Attorney's Office ever consulted with Defendants about what charges, if any, to bring against Louis. (Pls.' SMF at ¶¶ 48-49). Ultimately, Louis was found not guilty. (*Id.* at ¶ 44).

On November 3, 2009, the Board of School Directors ("Board') held Chelsie's expulsion hearing.[3] (*See* Board Adjudication, Doc. 33, Ex. 10). Though Chelsie was represented by counsel, she chose not to call any witnesses on her behalf at the hearing. (*Id.* at 1-2). On November 10, 2009, the Board, in an 8-0 vote, issued a written adjudication, including thirteen findings of fact, expelling Chelsie for one year. (*Id.* at 3-4). The Board found that Chelsie violated School Board Policy and the Student Conduct Code "by selling and distributing the controlled substance, LSD, or a look-alike drug . . . [which] "is a serious health, safety and welfare concern, especially in the school environment." (*Id.* at 4). "Chelsie enrolled in cyber school and never returned to the District." (Pls.' SMF at ¶ 57). The two students to whom Chelsie had admitted distributing drugs were also expelled from the School District. (*Id.* at ¶ 55).

---

[3] The school board members in attendance were Dawn Merris and John Rupp." (*Id.* at 1). "Superintendent Hood made the Administration's recommendation to the Board committee for expulsion." (*Id.* at 2). Among the witnesses for the School District Administration were Defendants Freeland and Bitz. (*Id.*).

On September 26, 2011, Plaintiffs filed a Complaint against Defendants Freeland

and Bitz as well as Officer Leah Rissinger and the Mechanicsburg Area School District.

(Doc. 1). After a motion to dismiss, the case has been narrowed to two claims brought

under 42 U.S.C. § 1983: (1) a claim for excessive force under the Fourth Amendment

(against Freeland), and (2) a claim for retaliation for engaging in First Amendment free

speech (against Freeland and Bitz).

## III. Standard of Review on Motions for Summary Judgment

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment

"should be rendered if the pleadings, the discovery and disclosure materials on file, and any

affidavits show that there is no genuine issue as to any material fact and that the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough*

*Corp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry

of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477. U.S. 242, 248, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

## IV. Discussion

"Section 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or laws of the United States." *Shuman v. Penn Manor Sch. Dist.,* 422 F.3d 141, 146 (3d Cir. 2005) (citing *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir. 2000)). "This section does not create any new substantive rights but instead provides a remedy for the violation of a federal constitutional or statutory right." *Id.* To establish a *prima facie* case under 42 U.S.C. § 1983, plaintiffs must demonstrate that: (1) they were deprived of a federal right; and (2) the person who deprived them of that right acted under color of state law. *Burrella v. City of Philadelphia,* 501 F.3d 134, 139 (3d Cir. 2007).

### A. Count I: Excessive Force

#### i. Louis Schmidt

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."

7

U.S. CONST. amend. IV. The Fourteenth Amendment extends the Fourth Amendment's prohibition against unreasonable searches and seizures to state officers, *Elkins v. United States*, 364 U.S. 206, 213, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960), as well as public school officials, *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985).

"To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (citing *Brower v. Cnty. of Inyo*, 489 U.S. 593, 599, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989)). "A seizure occurs for Fourth Amendment purposes when 'a reasonable person would have believed that he was not free to leave.'" *Shuman*, 422 F.3d at 147 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988)). Courts take "a broad approach in considering what constitutes a seizure," *Gallo v. City of Philadelphia*, 161 F.3d 217, 224 (3d Cir. 1998), and consider the totality of "all of the circumstances surrounding the incident." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980).

Plaintiffs contend that Defendants[4] used excessive force against Louis in violation of his Fourth Amendment rights. (Pls.' Br. in Opp., Doc 37, at 12-13). With regard to the alleged seizures of Louis, Plaintiffs argue that two incidences of physical contact between Louis and Defendants constitute unreasonable seizures. (*Id.* at 6-7). First, Louis claims that as they were leaving Freeland's office, that "Mr. Freeland threw his body into me and body

---

[4] Although Count I was brought against Defendant Freeland only, Plaintiffs appear to argue that Defendant Bitz also took part in the allegedly unlawful seizure(s) of Louis. The Court will treat this claim by Louis as against both Defendants Freeland and Bitz.

8

slammed me, slamming my back against the left hand side of the doorway[,] and told me you can't leave and put his arms up around me like he was a bear." (Pls.' SMF at ¶ 20). Second, Louis claims that while they were leaving the School building, Defendants seized Louis when Defendants "continued to act like two big bears blocking my body in between them." (Louis Dep. at 23:1-5).

In determining when use of physical force constitutes a seizure, courts within the Third Circuit draw a distinction between situations where there is "control over the plaintiff's body such that the plaintiff either succumbed to the force or was overpowered despite efforts to resist" and situations where there is either brief physical contact or no submission to the use of force. *Smith v. Dep't of Gen. Servs.*, No. 1:04-CV-0997, 2005 WL 1563505, at *10 (M.D. Pa. July 1, 2005) (distinguishing *Lloyd v. Jefferson*, 53 F. Supp. 2d 643 (D. Del. 1999)).

In *Lloyd*, the plaintiff videotaped the defendant police officer arresting her father. 53 F. Supp. 2d at 653. According to the plaintiff, the police officer demanded that the plaintiff leave, then grabbed and pushed her. *Id.* The plaintiff repeatedly stated:

"Don't touch me. Don't touch me. Take your hands off me. You are hurting me." Nonetheless, [the] plaintiff says that [the defendant] continued to hold her arm in a tight, *wrenching grip for a long period of time* and that every time plaintiff said, "Don't touch me," he changed and tightened his grip. In addition, [the] plaintiff alleges that [the defendant] pushed her around the corner of the building and detained her without cause. . . . As a result of [the defendant's] actions, . . . [the plaintiff] suffered contusions to her arm.

9

*Id.* (emphasis added). The next morning the plaintiff was treated in a hospital for her injures. *Id.* "Notes made by the attending physician reflect that the bruised areas on [the plaintiff]'s left arm had the appearance of a hand print with a thumb print to the front and palm and finger prints to the rear . . . ." *Id.* Viewing the facts in the light most favorable to the plaintiff, the court concluded a genuine issue of material fact existed regarding whether she was seized. *Id.* at 656.

In contrast, this Court granted defendants' motions for summary judgment in two subsequent cases where brief physical contact was insufficient to constitute a seizure. *Smith*, 2005 WL 1563505, at *9-10; *Coleman v. Cerski*, 3:04-CV-1423, 2007 WL 2908266, at *7-8 (M.D. Pa. Oct. 4, 2007). In *Smith*, the plaintiff police officer alleged that he was seized by his supervisor, a police sergeant. 2005 WL 1563505, at *1-2. While the plaintiff was chatting with one of his female coworkers, the defendant "approached [the plaintiff] from behind, grabbed his right arm, and stated, 'You've been up here long enough, come on.'" *Id.* at *1. In response, the plaintiff "went forward and then spun around and ripped his arm out of [the defendant]'s hands." *Id.* at *2. The plaintiff described the physical contact as "happen[ing] that quick." *Id.*

Similarly, the Court in *Coleman* compared the facts of that case to *Smith*, distinguished *Lloyd*, and granted defendant's motion for summary judgment on the ground that no seizure occurred. *Coleman*, 2007 WL 2908266, at *7-8. The plaintiff in *Coleman*, a volunteer with the local fire police, and the defendant, the chief of the local police

department, responded to a house fire. *Id.* at \*1. The parties disagreed whether a street should be blocked off. *Id.* According to the plaintiff, the defendant became "enraged" when she refused to acquiesce to the defendant's order to open the road. *Id.* In her deposition, the plaintiff claimed that the defendant "[g]rabbed my shoulder, pushed me back and pulled me forward. And he said, [']get off my fucking scene.['] I said, [']then get off my foot.[']" *Id.* at \*2. The defendant got off of her foot, and the plaintiff left the scene. *Id.*

Here, even resolving all factual disputes in Louis's favor and taking "a broad approach" to what constitutes a seizure (*Gallo*, 161 F.3d at 224), Louis fails to defeat summary judgment. Simply put, no seizure occurred. The incidents of physical contact that allegedly occurred here are more similar to those of *Smith*, 2005 WL 1563505, at \*9-10 and *Coleman*, 2007 WL 2908266, at \*7-8 than *Lloyd*, 53 F. Supp. 2d at 653.

First, the fact that the alleged seizures here involved a school official rather than a show of authority or use of force by a member of law enforcement supports the conclusion that Defendants did not seize Louis. Although "students' movement and location are subject to the ordering and direction of teachers and administrators," (*Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 171-72 (3d Cir. 2001) parents are not similarly subject to such directives. As a result, no reasonable person in Louis's position would believe that he was detained simply by virtue of the fact that Freeland allegedly told him that he could not leave and threatened to call the police if he did. Indeed, Louis made clear that he did not feel "that he was not free to leave." *See Shuman*, 422 F.3d at 147. Instead, he stated to Freeland,

11

"You cannot detain me." (Louis Dep. at 18:21-23), ignored Freeland's alleged demands to the contrary, and left the School with his daughter. (Id. at 31:6-13).

Second, as in Coleman and Smith, Louis was never under the physical control of either Freeland or Bitz. See Smith, 2005 WL 1563505, at *10; Coleman, 2007 WL 2908266, at *8. Defendants' alleged "assaults" of Louis did not deter him from leaving Freeland's office and, ultimately, the School. (Defs.' SMF at ¶ 22; Pls.' SMF at ¶ 22; Chelsie Dep. at 26:9-27:2; Louis Dep. at 31:6-13). Therefore, while there may have been physical contact between Louis and Defendants, that contact—unlike in Lloyd—did not rise to the level of physical control. See Smith, 2005 WL 1563505, at *10 (distinguishing Lloyd, 53 F. Supp. 2d at 653, where there was "control over the plaintiff's body such that the plaintiff either succumbed to the force or was overpowered despite efforts to resist").

Finally, as in Coleman and Smith, the alleged physical contact that occurred here was brief in duration. The entire encounter between Louis and Defendants lasted under two minutes as demonstrated by Louis's call to his wife at 3:05 p.m. when he arrived at the School, and his call to 911 at 3:07 p.m. after he and Chelsie had left Freeland's office. (Phone Records, at 2). See Smith, 2005 WL 1563505, at *10 (finding no seizure in part because the contact as having "happened that quick"); Coleman, 2007 WL 2908266, at *8 (finding the same because the contact was "very brief" and "a quick jerk"). Defendants' alleged "assaults" of Louis were similarly of a brief duration (Defs.' SMF at ¶ 22; Pls.' SMF at ¶ 22), which indicates no seizure occurred.

In sum, the actions of Freeland and Bitz, taken together and viewed in the light most favorable to Louis, would not lead a reasonable person in Louis's position to believe "that he was not free to leave." See Shuman, 422 F.3d at 147. Therefore, Freeland and Bitz are entitled to summary judgment on Louis's claim that he was seized in violation of his Fourth Amendment rights.

## ii. Chelsie Schmidt

### 1. Detention/Seizure under the Fourth Amendment

"Fourth Amendment rights, . . . are different in public schools than elsewhere; the reasonableness inquiry cannot disregard the schools' custodial and tutelary responsibility for children." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995). Although students do not "shed their constitutional rights . . . at the schoolhouse gate," Tinker v. Des Moines Indep. Comm. Sch. Dist., 393 U.S. 503, 506, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969), "[c]ourts have recognized that public schools are in a 'unique constitutional position,' because '[o]nce under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators.'" Gottlieb, 272 F.3d at 171-72 (quoting Wallace v. Batavia Sch. Dist., 68 F.3d 1010, 1013 (7th Cir. 1995)); see also Kurilla v. Callahan, 68 F. Supp. 2d 556, 561 (M.D. Pa. 1999) (quoting Vernonia, 515 U.S. at 655) ("Public school children are subject to the state's authority in a way that has been described as 'custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.'"). Moreover, the

13

Supreme Court has stated that against a student's privacy interest "must be set the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." *T.L.O.*, 469 U.S. at 339. The Court further observed that "in recent years, school disorder has often taken particularly ugly forms: drug use and violent crime in the schools have become major social problems." *Id.*

With regard to the alleged seizure of Chelsie, Plaintiffs argue that Defendants unreasonably seized Chelsie by questioning her before Bitz called her parents and, thereby, detained her "to execute a coerced statement." (Compl., Doc. 1, at ¶ 6; Pls.' Br. in Opp. at 13). It is uncontroverted that Chelsie's questioning lasted approximately twenty to twenty-five minutes as part of an investigation regarding the distribution of illegal drugs. (Pls.' SMF at ¶ 12). Although Chelsie claims she asked to speak with her father (*id.* at ¶ 25), it is unnecessary for the Court to determine whether Defendants' questioning of Chelsie without a parent present constituted a seizure. Assuming *arguendo* a seizure occurred, Defendants' questioning of Chelsie was reasonable in light of the disciplinary context in which it occurred. *See Shuman*, 422 F.3d at 148-49.

In *Shuman*, the Third Circuit Court of Appeals affirmed summary judgment in favor of the defendant, where the defendant assistant principal detained a plaintiff student in a small conference room to investigate serious accusations of misconduct. *Id.* at 144. There, the student was instructed to remain in the conference room for nearly four hours, while the assistant principal investigated an incident of sexual misconduct and determined the

14

appropriate punishment. *Id.* Here, Defendants' questioning of Chelsie was relatively brief. *See id.*; *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075, 1080 (5th Cir. 1995) (finding confinement of a misbehaving student for fifty minutes at juvenile detention center during school-sponsored field trip reasonable). Moreover, Defendants were investigating the distribution of illegal drugs in the School, a "particularly ugly form" of student misconduct. *See T.L.O.*, 469 U.S. at 339. Therefore, Defendants' questioning of Chelsie was reasonable in light of the circumstances surrounding the investigation.

## 2. Excessive Force under the Fourteenth Amendment

Second, Plaintiffs allege that Freeland used excessive force when he "with great force grabbed hold of Chelsie's arm violently jerking it back and pulling her back towards him." (Compl., Doc. 1, at ¶ 12).

In the context of an alleged school seizure, not only does the "momentary use of physical force" by a school official during a student disciplinary situation not constitute a seizure, it "is a scenario to which the Fourth Amendment does not textually or historically apply." *Gottlieb*, 272 F.3d at 172 (citing *Kurilla*, 68 F. Supp. 2d at 563). Instead, in *Gottlieb*, the Third Circuit adopted "the Fourteenth Amendment's shocks the conscience standard to federal claims alleging the use of excessive force by public school officials." *Id.* The Court articulated a four-part test to determine whether a school official's actions rose to the level of "shocking the conscience" on a student's claim of excessive force:

a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this situation?; c)

15

> Was the force applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm?; and d) Was there a serious injury?

*Id.* at 173. In *Gottlieb*, the Third Circuit addressed a situation in which the student-plaintiff claimed that her assistant principal (Carbonara) "pushed her shoulder with his hand, propelling her backwards into a door jam. As a result of this contact, Gottlieb's lower back struck the door jam." 272 F.3d at 171.

In analyzing Gottlieb's claim using the four-part test, the Third Circuit held that there appeared to be "no reason for Carbonara to physically discipline Gottlieb, and he has not offered any justification for the alleged act," and because there was no pedagogical objective, "excessivity is simply not an issue." *Id.* at 174. The Circuit then turned to the third prong of its test, "whether the force applied by Carbonara was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (internal citations and quotation marks omitted). "Because a constitutional violation will only arise if [the defendant's] actions were malicious and sadistic, it is the *harm*, and not the contact, that must be intended." *Id.* at 175 (emphasis added).

The Circuit noted that the defendant "did nothing more than place his hand on Gottlieb's shoulder and push her back inches to the door jamb. The push itself was so minor that even if the injuries she alleges occurred, it cannot be inferred from the act itself that Carbonara intended to act maliciously and sadistically." *Id.* "Thus, Carbonara's conduct, although possibly tortious, does not give Gottlieb a constitutional cause of action.

Carbonara's placing his hand on a student's shoulders and moving her mere inches is not a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* (internal citations and quotation marks omitted). Because Gottlieb did not meet the third prong, the Court did not address "whether the alleged injury was sufficient to support a constitutional claim." *Id.* n.2.

Analyzing Chelsie's claim for excessive force under the "shocks the conscience" standard of the Fourteenth Amendment, the Court concludes that even resolving all factual disputes in her favor, Defendant Freeland is entitled to summary judgment. The Complaint avers that Freeland "with great force grabbed hold of Chelsie's arm violently jerking it back and pulling her back towards him." (Compl., Doc. 1, at ¶ 12). Similarly, in Plaintiffs' Brief in Opposition to Defendants' Motion, they repeat that Freeland, "with great force, grabbed hold of Chelsie's arm jerking it back and pulling her back towards him." (Doc. 37, at 7). Chelsie's own testimony, however, was that Freeland "yanked me back a little bit and then he let go." (Chelsie Dep. at 27:23-28:3). The "yank" occurred for a "shorter period of time." (*Id.* at 28:4-10).

Assuming that there was no pedagogical objective to be accomplished by yanking Chelsie's arm (thereby precluding the necessity of determining whether the act was excessive), there is no evidence that Freeland acted "maliciously and sadistically for the very purpose of causing harm." *See Gottlieb,* 272 F.3d at 174. By Chelsie's own words, Freeland "yanked [her] back a little bit and then he let go," and the yank was relatively brief.

17

(Chelsie Dep. at 27:23-28:10). From these allegations alone, "it cannot be inferred from the act itself that [Freeland] intended to act maliciously and sadistically so as to constitute a constitutional violation." *See Gottlieb*, 272 F.3d at 175.

Finally, even if Chelsie could meet the third prong, there is virtually no evidence that she suffered any physical injuries to either her left or right arm. Defendants point out that Chelsie sought medical attention for her *left* arm which Louis had been holding, but "[b]oth Louis and Chelsie testified that Freeland grabbed her *right* arm. (Defs.' SMF at ¶¶ 32, 35 (emphasis in original) (citing Chelsie Dep. at 27:24-28:2; Louis Dep. at 30:9-14)). However, Chelsie's doctor, Kiran Sharma, wrote in her notes that Louis stated that Freeland "grabbed [Chelsie's] left arm and pulled it in his presence while they were all at a meeting." (Chelsie Medical Records, Doc. 33, Ex. 9). Dr. Sharma prescribed Chelsie pain medication and noted "[n]o external bruising of the left arm or the shoulder, no hematomas . . . [and] no dislocation." (*Id.*). Given the lack of any identifiable injuries other than complaints of pain, Chelsie cannot show she suffered a "serious injury" to make out a case of excessive force under the Fourteenth Amendment. *See Gottlieb*, 272 F.3d at 174-75 (contrasting the case with *Metzger v. Osbeck*, 841 F.2d 518 (3d Cir. 1988) in which the Third Circuit reversed the district court's grant of summary judgment in favor of a physical education instructor/wrestling coach because he placed a student in a choke hold, causing the student to lose consciousness and fall to the pavement which resulted in a broken nose, fractured

teeth, and other injuries requiring hospitalization). Therefore, the Court will grant

Defendants' motion for summary judgment on Chelsie's claim of excessive force.

## B. Count II: Retaliation

To prevail on a First Amendment retaliation claim, "a plaintiff must prove (1) that he

engaged in constitutionally-protected activity; (2) that the government responded with

retaliation; and (3) that the protected activity caused the retaliation." *Miller v. Mitchell*, 598

F.3d 139, 147 (3d Cir. 2010) (internal quotation marks omitted).

Here, Plaintiffs allege two protected acts caused two retaliatory acts by Defendants.

First, Plaintiffs allege that "[u]sing their influence with the local police[,] defendants caused

the plaintiffs to be unlawfully charged in retaliation for their contacting and summoning

police from whom they were seeking protection." (Comp., Doc. 1, ¶ 37). Defendants rely on

the affidavit of Officer Rissinger, who issued the citation against Louis (*id.*), which states that

she made her "own independent determination to file . . . the citation against Louis E.

Schmidt, without the encouragement, direction, influence or inducement of Andrew Bitz or

Jeremy Freeland" (Rissinger Aff., Doc. 33, Ex. 11). Plaintiffs fail to put forth any specific

facts that would allow a reasonable jury to conclude that Officer Rissinger issued a citation

to Louis because he had called the police. Instead, Plaintiffs argue in their Brief in

Opposition "that given the sometimes daily affiliation between local police and school

officials, . . . the resultant 'harassment' charge brought by Rissinger against Louis (which

was quite baseless) were [*sic*] the result of local school officials/police parochialism." (*See*

Doc. 37 at 15). Such a bare assertion by itself is insufficient to survive a motion for summary judgment. *Fireman's Ins. Co. of Newark, N. J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Therefore, Defendants are entitled to summary judgment on Plaintiffs' First Amendment claim that Defendants caused a citation to be issued to Louis in retaliation for Louis's act of calling the police.

Second, Plaintiffs allege that Chelsie was expelled in retaliation for Louis's call to the police and for defending the charge that she was distributing drugs at School. (Pls.' Br. in Opp., Doc. 37, at 15; Comp., Doc. 1, at ¶¶ 18, 23, 26). In the Complaint, Plaintiffs assert that retaliatory animus can be gleaned from the fact that Chelsie was expelled despite "successfully defending their charges before the school board." (Doc. 1 at ¶ 26).

Defendants reply that Chelsie was expelled because "the Board of School Directors determined there was sufficient evidence to expel her, namely, her admitted distribution of a controlled substance on school property." (Defs.' Br. in Supp., Doc. 33, at 13). In support of their argument, Defendants note that Chelsie's expulsion was predicated on thirteen findings of fact by the Board after "a standard formal hearing conducted consistent with District policy and state law." (*Id.* (citing Board Adjudication, Doc. 33, Ex. 10)). Though Chelsie was represented by counsel, she chose not to call any witnesses on her behalf at the hearing. (*See* Board Adjudication, Doc. 33, Ex. 10, at 1-2). As a result, Defendants argue that Plaintiffs have failed to "show some causal link between their defense of Chelsie's expulsion charges and her subsequent expulsion." (Defs.' Br. in Supp. at 14).

Defendants' argument—that the Board's decision to expel Chelsie based on its findings of fact, including her admission to distributing drugs in School (see Chelsie Statement, Doc. 33-2, Ex. 7)—is sufficient to demonstrate that the Board would have expelled Chelsie notwithstanding her decision to defend the charge against her.

Additionally, Plaintiffs are suing Freeland and Bitz for First Amendment retaliation. Yet, it was the *Board* that expelled Chelsie from the School District. While Defendants Freeland and Bitz appeared as witnesses at the expulsion hearing, they were not the decision-makers who expelled her from the School District for a year.

Finally, there is no evidence that Chelsie was singled out for expulsion by either Defendants or the School District. The two students to whom Chelsie had admitted distributing drugs also were expelled from the School District. (Pls.' SMF ¶ 55). Had Chelsie been the only one expelled, it may have raised an inference of retaliation, but the undisputed evidence is that all three students were expelled for their conduct in distributing or receiving drugs.

Defendants have established that there are no genuine issues of material fact, and Plaintiffs' Brief in Opposition is silent as to this claim of retaliation. (See Doc. 37, at 14-15). Therefore, Defendants are entitled to summary judgment on Chelsie's claim that she was expelled in retaliation for calling the police and defending herself at her expulsion hearing.[5]

---

[5] Because the Court is granting summary judgment in favor of Defendants on all of Plaintiffs' claims, it is unnecessary for the Court to address the issue of whether Defendants are entitled to qualified immunity.

## V. Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion for Summary

Judgment. (Doc. 31). A separate Order follows.

Robert D. Mariani
United States District Judge